CRAIG BROKERAGE COMPANY ET AL. *v.* JOSEPH A. GODDARD COMPANY.

[No. 14,080.   Filed February 20, 1931.]

*Gentry, Cloe & Campbell* and *Walter G. Todd,* for appellants.

*Thomas E. Kane* and *Silverburg, Bracken & Gray,* for appellee.

CURTIS, J.—This is an action in replevin by the Joseph A. Goddard Company, appellee herein, against the Craig Brokerage Company, Robert L. Craig and Tripp Warehouse Company, appellants, for the possession of 950 cases of canned tomatoes alleged to be the property of appellee and to have been wrongfully detained by the appellants. The complaint was in the usual form in replevin and was in one paragraph; answer in general denial by Craig Brokerage Company and Robert L. Craig.

The facts were found specially by the court and are, in substance, as follows: Appellee is an Indiana corporation and, for more than 25 years prior to this action, had been in the wholesale grocery business at Muncie, conducting such business within a radius of 50 miles of Muncie; appellee had adopted and used in its trade the name "Delicious Brand" for certain of its canned goods and had sold to its customers within the 50-mile radius canned goods bearing the "Delicious Brand" label, which fact was known to the appellants; the Thompson-Weber Company was a co-partnership engaged in the canning business at Hartford City, and Eldon J. Weber was a partner and manager of such business; on and prior to September 20, 1927, the Thompson-Weber Company was indebted to appellee in the sum of $1,000 for money theretofore advanced by appellee to appellant to apply on purchase price of a carload of beans to be canned and

delivered to appellee during the year 1926, but said beans were never delivered and, on September 10, 1927, this sum was due and wholly unpaid.

The court further found that, on September 20, 1927, appellee entered into a contract with the Thompson-Weber Company, by which the Thompson-Weber Company sold to appellee 1,000 cases of two dozen per case number 2½ cans extra standard canned tomatoes and at a price of $1.35 per case, such tomatoes to be packed by the Thompson-Weber Company during the canning season of 1927; the $1,000 then owing by the Thompson-Weber Company to appellee to be applied on the purchase price of the tomatoes and balance to be paid upon delivery. On or about September 20, 1927, the Thompson-Weber Company executed and delivered to appellee a written instrument signed by the Thompson-Weber Company and Eldon J. Weber. (The written instrument was made a part of the findings.)

The court further found that, on October 4, 1927, Eldon J. Weber called at appellee's office and informed appellee that a carload of empty cans to be used in canning appellee's tomatoes had arrived at Hartford City with a sight draft of $1,376.21 attached to the bill of lading; that the Thompson-Weber Company could not secure the money to pay the draft, and stated that, if appellee would advance the money to pay the draft, such money so advanced would be credited on the purchase price of the tomatoes, and that the tomatoes would be packed and shipped to appellee within a few days; that appellee communicated by telephone with James Cronin, Jr., president of Citizens State Bank of Hartford City, and informed him that appellee had purchased a car of number 2½ canned tomatoes from the Thompson-Weber Company, to be packed out of the 1927 pack, and that Weber had asked an advance of $1,376.21 to take up the sight draft held by the bank upon the car of emp-

ty cans to be used in packing the tomatoes so purchased and that Weber had agreed to credit the $1,376.21 on the purchase price of the tomatoes; that Cronin stated the Thompson-Weber Company was not financially responsible, but that he thought Eldon J. Weber would carry out his agreement; appellee thereupon issued and delivered to Eldon J. Weber his check for $1,376.21 payable to the Citizens State Bank of Hartford City; the Thompson-Weber Company used the proceeds in payment of the sight draft and to secure the empty cans; Weber informed Cronin of the $1,376.21 advance made by appellee and of his agreement to credit this amount on the purchase price of a carload of tomatoes to be shipped to appellee; on or about October 15, 1927, the Thompson-Weber Company packed 950 cases of number 2½ cans extra standard tomatoes and labeled each can with labels furnished by appellee bearing the words "Delicious Brand Tomatoes, Jos. A. Goddard Co., Distributors, Muncie, Indiana." The 950 cases of tomatoes so labeled were stacked in the warehouse of the Thompson-Weber Company in a stack separate and apart from any other merchandise. On or about October 15, 1927, Weber informed appellee that appellee's tomatoes had been packed and labeled and would be loaded and shipped to appellee the next day, that a bill of lading for same would be sent to plaintiff as soon as same had been labeled; that on, or about the same day, a bill of lading was made out by the Thompson-Weber Company, but such bill of lading was not signed by the railroad company nor delivered to appellee.

The court further found that the Craig Brokerage Company is an Indiana Corporation engaged in the sale of canned goods in the city of Indianapolis and that Robert L. Craig is president and Fred J. Tilley vice-president of the Craig Brokerage Company; on October 16, 1927, the Thompson-Weber Company entered into

a verbal agreement with the Craig Brokerage Company, hereinafter referred to as "appellant," in which it agreed to sell to appellant 950 cases number 2½ canned tomatoes for $1,500 to be paid upon delivery of the tomatoes; that, at that time, the Thompson-Weber Company did not have in its possession 950 cases of 2½ cans of tomatoes except the 950 cases packed for appellee and labeled with appellee's labels. At the time of making the agreement, Fred L. Tilley was present at the plant of Thompson-Weber Company and saw the 950 cases of tomatoes, which had been packed and labeled for appellee; he opened one of said cases and discovered the cans were labeled with appellees "Delicious Brand" labels bearing appellee's name thereon; on October 17, 1927, Tilley was present at the Thompson-Weber plant when cases of tomatoes from the stack of 950 cases, canned and labeled for appellee, were being loaded into freight cars; Tilley entered the car, opened a number of such cases and discovered the same were labeled with appellee's "Delicious Brand" labels; Tilley then communicated with Eldon J. Weber, who agreed to make an allowance of $75 to appellants on the purchase price of the tomatoes for stripping the labels from such cans. After appellant discovered the cans were labeled with appellee's labels, it did not inquire of appellee as to whether appellee was making any claim to the tomatoes. The 950 cases of number 2½ cans of tomatoes are the same cans of tomatoes in controversy and the same were shipped, on October 18, 1924, from Hartford City over the Pennsylvania Railroad, and delivered to the Tripp warehouse on October 24, 1927, and stored therein until October 28, 1928, when they were levied upon and taken possession of by the sheriff of Marion County by virtue of a writ of replevin; on arrival of these cases of tomatoes at the Tripp warehouse, employees of Craig Brokerage Company were employed to strip the labels off the

cans, and the labels of 397½ cases of tomatoes had been stripped at the beginning of this action, but the labels remained on 522 cases when the same were delivered to appellee by the sheriff; on October 25, 1927, before this action was commenced, appellee demanded possession of the tomatoes from the Craig Brokerage Company, but Robert L. Craig stated the tomatoes had been shipped out of the state; on October 18, 1927, a draft for $1,377.50 was drawn in the name of Citizens National Bank of Hartford City, Indiana, upon Robert L. Craig, the same being forwarded with bill of lading attached for the carload of tomatoes to the Peoples' State Bank of Indianapolis, for collection, and was, on October 22, 1927, paid by the Craig Brokerage Company, the proceeds of the draft being delivered to the Citizens State Bank of Hartford City, the amount thereof being credited on an indebtedness owing the bank by the Thompson-Weber Company; no bond or undertaking being executed by appellants for possession of the tomatoes within 24 hours after the sheriff had taken possession of the same, appellee executed a written undertaking to appellants, with surety approved by the sheriff, for possession of the tomatoes, and the same were afterwards shipped by appellee to Muncie and placed in appellee's warehouse; at the time of filing appellee's complaint, the tomatoes in controversy had not been taken for any tax, assessment or fine pursuant to any statute, nor had the same been seized under any execution or attachment against property of appellee, and the value thereof was $2,500, and said tomatoes were wrongfully and unlawfully detained by appellants from appellee in the county of Marion, State of Indiana.

Upon these facts as above set out, the court stated conclusions of law thereon to the effect that: (1) The law in this case is with the plaintiff; (2) on October 27, 1927, appellee was the owner and entitled to possession

of the tomatoes in controversy, and, on such date, the same was wrongfully and unlawfully detained from appellee by appellants in the county of Marion, State of Indiana; and (3) the appellee is entitled to judgment against appellants for possession of the tomatoes and costs of the action.

Motion for new trial being overruled, appellants appealed, assigning as error in this court: (1) That the court erred in each conclusion of law; (2) the overruling of the motion for new trial, under which the errors assigned are: (a) insufficiency of evidence; (b) decision contrary to law; (c) error in admitting certain evidence and certain exhibits, and error in exclusion of certain evidence.

Both appellants and appellee agree that but two main questions present themselves for solution. Appellants say: (1) That the contract between appellee and the Thompson-Weber Company was executory and that no title to the property in question passed to appellee; (2) that the title to the property in question could not have been transferred to appellee on account of a valid chattel mortgage to the Citizens State Bank of Hartford City from the Thompson-Weber Company. These two questions will be taken up in the order named.

The evidence disclosed, and the court, in its special findings of fact, found that, prior to September 20, 1927, the Thompson-Weber Company was indebted to appellee in the sum of $1,000, for money advanced the previous year by the appellee to pay for a carload of beans which was not delivered and that this sum of money, by agreement of the parties, was to be applied by the Thompson-Weber Company on the purchase price of the car of tomatoes in question; that a written memorandum of the sale of the car of tomatoes was executed by the Thompson-Weber Company and delivered to appellee on September 20, 1927. This written memorandum

fixed the price of the car of tomatoes as follows: "1,000 [evidently cases] No. 2½ Ex. Standard Tomatoes at $1.35 doz. f. o. b. Muncie, Plus $25.00 for Machine Rental, Less 3% Net Cash." There was no evidence to explain the meaning of the term "f. o. b. Muncie." The appellant insists the term means that, as a condition precedent to the passing of title, the tomatoes had to be delivered to Muncie. Appellee insists the term simply means freight allowed to Muncie, which appellee could deduct on final settlement.

In the instant case, it will be noted the term "f. o. b. Muncie" is used in connection with the fixing of the price of the car of tomatoes. If no place be designated by the contract, the general rule is that goods sold are to be delivered where they are at time of sale. *Harley Hardware Co.* v. *Harry S. Laford Co.* (1922), 28 Ga. App. 584, 112 S. E. 394; *International Co.* v. *Sun-Maid Co.* (1925), 146 Md. 608, 127 Atl. 393. In the absence of a provision in a contract of sale to the contrary; the place of delivery is generally place where goods are at time of sale. *Salmon* v. *Helena Box Co.* (1906), 147 Fed. 408, 77 C. C. A. 586. The law implies delivery of stock to the place of seller, nothing appearing to the contrary. *Neer* v. *Lang* (1918), 252 Fed. 575, 164 C. C. A. 491. Generally, if the agreement is to sell goods "f. o. b." at a designated place, it will ordinarily be regarded as the place of delivery, but the effect of the term "f. o. b." depends on the connection in which it is used, and, if used in connection with words fixing price only, it will not be construed as fixing place of delivery. *Meyer* v. *Sullivan* (1919), 40 Cal. App. 723, 181 Pac. 847.

The weight of authority supports the doctrine that a contract of sale, which, in connection with the price, employs the term f. o. b. at a given point, does not require the seller actually to deliver the goods at indicated point; but that expression qualifies only

the price, and means that wheresoever the goods may be shipped, the seller will either pay freight to the indicated point, or if the goods are not shipped there, it will deduct, or permit the purchaser to deduct, from the fixed price the amount of freight to the point indicated. See *Pond Creek Mill & Elevator Co.* v. *Clark* (1920), 270 Fed. 482; *Neimeyer Lumber Co.* v. *Burlington, etc., R. Co.* (1898), 54 Nebr. 321, 74 N. W. 670, 40 L. R. A. 534. As to what amounts to a delivery f. o. b., see 16 A. L. R. 590.

Price quoted "f. o. b." residence of proposed purchaser does not necessarily imply delivery at that point. *Somerset Door & Column Co.* v. *O. M. Weber Co.* (1909), 43 Pa. Super. Ct. 290.

In *Neimeyer Lumber Co.* v. *Burlington, etc., R. Co., supra,* the contract was for a sale of lumber "f. o. b. Omaha," and the court there said: "The word 'prices' which precedes 'f. o. b. Omaha, Nebraska,' is of importance in the construction of this contract. By that expression Neimeyer & Co. meant that the prices which they had affixed to the lumber sold Simpson & Co. were to be the prices which the lumber should cost Simpson & Co. at Omaha; not that the delivery of the lumber to Simpson & Co. should take place at Omaha, but that the price charged Simpson & Co. by Neimeyer & Co. for the lumber was to be its price at Omaha; in other words, that Neimeyer & Co. should pay the freight on this lumber from Waldo, Arkansas, to Omaha, Nebraska; or, what is the same thing, that Simpson & Co., or their vendee, Dietz, might pay the freight and then remit the purchase price of the lumber less the freight. But the fact that Neimeyer & Co. agreed to pay the freight on this lumber from its place of shipment to its place of destination does not afford conclusive evidence that the delivery of the lumber was to take place at Omaha, Nebraska."

In the case under consideration, it will be noted there was no place designated as the place of delivery, and we hold that, inasmuch as the term "f. o. b. Muncie" was clearly used in connection with the price, and only in that connection, the place of delivery was not Muncie, as appellants contend. The term "f. o. b." as used herein, did not require Thompson-Weber Company to deliver the tomatoes at Muncie before the title passed, but this term qualified the price, to the effect that the Thompson-Weber Company would either pay the freight to Muncie, or, if the goods were not shipped, appellee would be entitled to deduct from the fixed price the amount of freight to that place.

It is argued that the contract was executory and title could not pass to appellee, but, in this contention, we cannot agree. The authorities are numerous where the expression is used that, if anything remains to be done by the seller, the title does not pass; but the cases which are referred to to sustain that position only go the length of showing that, where something is to be done by the seller to ascertain the identity, quality or quantity of the article sold, or to put it in the condition which the terms of the contract require, the title does not pass. *Terry* v. *Wheeler* (1862), 25 N. Y. 520.

In *Farmers Nat. Bank* v. *Coyner* (1909), 44 Ind. App. 335, 88 N. E. 856, the bill of sale in question was for a crop of corn to be grown. The court said: "In such case no title passes until the crop is grown and notice given to the vendee, or some act done by the vendor designating it as the article sold, either by setting it apart, marking it, or some other similar act. . . . But these general rules are founded on the presumed intentions of the parties. If there are attendant circumstances from which the intention may be inferred that the property shall pass at another or different time, or under other and different circumstances, that intention

will be effectuated. . . . The parties to the contract may agree when and under what conditions the property in question shall pass to the prospective owner. . . . Their intention must be the governing consideration in every case. . . . This intention, as well as whether the contract has been executed, is a question of fact to be determined from the terms and stipulations of the agreement and actions of the parties. . . . And in determining what constitutes a change of possession or delivery of personal property, due regard must be had to the character of the property, the nature of the transaction, the position and relations of the parties to the sale and the intended use of the property."

"Where the terms of a contract have been definitely agreed upon, and the goods have been specifically ascertained, and nothing remains to be done by the seller except to deliver the goods, or by the buyer except to pay for them, the title will, unless a contrary intention appears, vest at once in the buyer, even though the goods have not been delivered or paid for. In such a case, the buyer may retain possession until the goods are paid for; but it is possession which he thus retains and not title." *German-American Ins. Co.* v. *Shepherd* (1920), 78 Ind. App. 314, 126 N. E. 447.

The question of possession is sometimes significant, but it is not the true criterion; for, as will be seen, the title may pass though the seller retains possession, or the title may be retained though possession has been given to the prospective purchaser. The true criterion is the intention of the parties, to be discovered, when possible, from their express declarations; and where this is not possible, to be gathered from all the circumstances of the case, as well as from their declarations. Mecham, Sales (6th ed.) §477.

As was said in *Coddington* v. *Turner, Rec.* (1923), 85 Ind. App. 604, 139 N. E. 323: "If the contract between

appellants and the canning company is for the sale of goods to be thereafter manufactured, it is an executory contract, and ordinarily no title passes under such a contract until the thing is completely finished and notice given to the vendee, or some act done by the vendor designating it as the article sold, either by setting it apart, marking it, or some other similar act. Even in the case of articles manufactured expressly for a party, title passes only upon completion according to the contract and delivery, or tender of delivery. While this is the general rule, there is no doubt but that parties may by their contract fix a different time when the title shall pass, and if it clearly appears from the contract that the parties intended the title should pass at a given time or at a designated stage of manufacture, or without any formal delivery or tender, such intention would no doubt govern."

The $1,000 advanced on the beans, which were never delivered, was applied on the purchase price of the tomatoes. On September 27, 1927, Fred R. Jones, president of appellee company, was at the factory and Weber told him if he would get the labels over right away, that "as soon as we get the car of empty cans unloaded, we will pack *your* tomatoes and get them off to you at once." The evidence further shows that on October 4 Weber was in the office of appellee and stated that the car of cans had arrived; that he did not have the money to take up the draft, but, if appellee would take up the draft, so he (Weber) could get the cans, he would pack *their* (appellee's) tomatoes and ship them. The draft was taken up with the $1,376.21 advanced by appellee. Weber, on October 10, 1927, by phone, told Jones, president of appellee company, "I have them [tomatoes] all ready for you and labeled, but I am now waiting for some cases, and, as soon as they arrive, we will load your car at once and ship them." Three days later, he noti-

fied appellee that the tomatoes were ready and would probably be shipped the next day. A bill of lading made out in the handwriting of Weber to appellee was found in the office of the Thompson-Weber Company. There was evidence to show that the balance of the purchase price was to be paid upon the arrival of the tomatoes at Muncie. These facts clearly show that it was the intention of the parties that title to the goods should pass before they were actually delivered to appellee at Muncie, and that the balance was to be paid upon their arrival at Muncie.

In the instant case, the tomatoes were canned, labeled and set apart and were thereby fully identified. The contract had been sufficiently executed when the tomatoes were canned, labeled and marked and set apart from all other merchandise and notice of such given to appellee by Thompson-Weber Company to pass title to appellee. After the cans were labeled, set aside and the purchasers notified, the vendors, Thompson Weber Company, acted only as bailees. See *Martz* v. *Putnam* (1888), 117 Ind. 392, 20 N. E. 270.

On October 12, 1927, the Thompson-Weber Company executed a chattel mortgage on the goods in question to the Citizens State Bank of Hartford City. This mortgage also covered any additions made to this stock of goods. The mortgage was duly recorded October 17, 1927. Appellants earnestly insist that, because of this mortgage, no title could have passed to appellee; that the bank as mortgagee had a paramount title, superior to that of any one else, "provided it took possession and claimed the property before the rights of others attached." Appellants further contend the mortgagee took possession when the tomatoes were shipped to Indianapolis October 18, 1927, consigned to such mortgagee, Citizens State Bank. The bank, at the time of the execution of its chattel mortgage, knew that ap-

pellee had paid Thompson-Weber Company $2,376.21 in cash to apply on the purchase price of $2,565 for the 950 cases of tomatoes. It, in fact, had been consulted by appellee before payment of the last $1,376.21 of above-mentioned amount, and had, in effect, told appellee that appellee would be safe in paying said sum of money. The bank's mortgage covered other property which it deemed sufficient security. Under the facts, it seems clear that, even if we might reasonably conclude (which we do not) that the Craig Brokerage Company secured from the bank whatever title the bank had to the car of tomatoes, yet the bank had no title which might defeat the title of the appellee. The Craig Brokerage Company did not know for several days after their alleged purchase of the tomatoes that the bank had such chattel mortgage. Certainly, the Craig Brokerage Company did not obtain any title by its alleged purchase, on October 16, 1927, of the car of tomatoes from the Thompson-Weber Company that might defeat the title of appellee. Through their officer, Tilley, they knew that 950 cases of tomatoes had upon them the labels of appellee and that they were separated and piled apart from the other merchandise of the Thompson-Weber Company. We recognize that, this being an action in replevin, the appellee must recover on the strength of its own title or right of possession and not upon the weakness of the title or right of possession of its adversary. This law is well settled and not disputed by appellee, and we cite no authority to sustain it, but we conclude that, under the facts in this case, sufficient acts had been done to pass title to the property in question to appellee and that its action in replevin would lie.

A finding in regard to the mortgage in question thus became immaterial, and the court's failure to find an

immaterial fact is not a reversable error. *Carnahan* v. *Shull* (1913), 55 Ind. App. 349, 102 N. E. 144. Other minor questions are presented as to admission and rejection of certain evidence and exhibits, but, in the light of the conclusion herein reached, we find no prejudicial error in that regard.

Judgment affirmed.