**Fred J. EISERT and Ralph Oboth**

v.

**URICK FOUNDRY COMPANY.**

**Civ. A. No. 392.**

United States District Court
W. D. Pennsylvania.

Feb. 21, 1957.

William W. Knox, Erie, Pa., for plaintiff.

Gifford, Graham, MacDonald & Illig, Erie, Pa., for defendant.

WILLSON, District Judge.

In this civil action the two plaintiffs have sued the defendant corporation, invoking the provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., to recover minimum wages, overtime compensation, liquidated damages and counsel fees under Sections 6, 7 and 16 of the Act. The case was tried nonjury. It has some unusual aspects. The defendant corporation is the successor in ownership of a foundry business formerly owned by the plaintiffs and three other persons and operated as a partnership in the City of Erie. On the formation of the defendant corporation on July 1, 1947, plaintiffs each became 20% stockholders, directors and vice presidents of the corporation. In this lawsuit plaintiffs contend that as of February 1, 1954 they became entitled to the minimum wages and overtime compensation as provided in the Act.

*The Factual Situation Prior to April 26, 1954.*

Prior to the date mentioned there is no dispute of any consequence in the evidence. The evidence consists of the pretrial stipulations, documentary evidence introduced and the testimony taken during the trial. From the evidence the court finds the following facts:

The plaintiffs, Fred J. Eisert and Ralph Oboth, are individuals, both residing in the City of Erie, Erie County, Pennsylvania, and the defendant is a Pennsylvania corporation with principal offices located at 620 West 15th Street, Erie, Pennsylvania. The defendant was and is engaged in the production of goods in interstate commerce.

In 1937, Ray W. Britton and E. J. Hedland purchased the Erie Foundry Company, situate in Erie, Pennsylvania. This company was and is a manufacturer of gray iron and semi-steel castings. They formed a partnership to operate the business, Britton owning a 60% interest and Hedland owning a 40% interest.

In 1941 Ray W. Britton divided his 60% partnership interest three ways. He retained for himself a 20% interest and transferred to his son, John E. Britton, a 20% interest and to his daughter, Betty B. Davis, a 20% interest, so that thereafter the partnership consisted of Ray W. Britton, John E. Britton, Betty B. Davis, each owning 20% or a total of 60%, and E. J. Hedland, owning a 40% interest. In October of 1942 Hedland died. The Britton family then purchased the Hedland interest in the partnership for the sum of $50,000. Neither Ray W. Britton nor his son or daughter had manufacturing knowledge or experience in the foundry business. Ray W. Britton and his son and daughter at all times pertinent here have depended upon others for practical foundry knowledge and experience. In 1942 plaintiff Ralph Oboth was the superintendent of production in the partnership. At that time plaintiff Fred Eisert was employed by the Griswold Manufacturing Company, also a manufacturer of gray iron castings in the City of Erie. The two plaintiffs had the requisite knowledge and experience needed by the Brittons for the foundry business and through Ray W. Britton were brought into the Urick Foundry Company as partners in charge of the active management of the production end of the firm. The two plaintiffs purchased the 40% interest formerly owned by Hedland from the Brittons for the sum of $40,000. They did not pay cash. The partnership was reorganized with each of the plaintiffs acquiring a 20% interest as owners and partners, with each to pay for his interest from the profits of the business as his share earned profits. The Britton family continued owning the 60% interest in the partnership, divided as it was at the time Mr. Hedland died.

On January 1, 1943, therefore, on the reorganization of the partnership, each of the partners owned a 20% interest, with the plaintiffs having full charge of production; and the business was successful and profitable. During the five years from 1943 to 1947, inclusive, each of the plaintiffs drew as salary $17,550 and profits of $86,200, or a total of $103,750 each, for the five-year period.

On July 1, 1947, the partnership was dissolved and the business was incorporated as a Pennsylvania corporation under the same name "Urick Foundry Company." Each of the five partners were the incorporators. Each took a 20% stock interest, so that the five former partners then became the owners of equal amounts of all of the corporate stock of the defendant. At the organization meeting of the corporation, Ray W. Britton was elected president and treasurer and plaintiffs were each elected as directors and vice presidents. The two plaintiffs remained as 20% stockholders and as directors until August 12, 1955, when they sold their stock to the company for $40,000 each. In the meantime, however, events occurred which led to ill feeling, particularly between Ray W. Britton and the two plaintiffs.

During 1948, the first year of the corporate existence, each plaintiff received $11,000 as salary and dividends of $10,050. In 1949, each plaintiff received a salary of $12,000 and dividends of $10,000. Thereafter no dividends were paid. In 1950, plaintiffs each received a salary of $12,000. In 1951, their salary was $14,000. In 1952 and 1953, the salaries were $14,400 each and in 1954, they drew $8,400 in salaries, each plaintiff having,

during the corporate existence from 1948 through February 1, 1954, drawn $86,200 as salary and $20,050 as dividends.

Commencing in 1950 and continuing through 1951, 1952 and 1953, the corporation embarked upon an extensive expansion program costing the corporation in excess of $450,000. In 1953 business was bad. The defendant's sales and profits declined and losses were incurred. Because of the loss of business and the need for working capital to finance the expansion program, at a stockholders meeting attended by all five of the owners, the Britton family suggested that each of the stockholders advance the corporation $30,000 in new capital. The plaintiffs demurred to the proposal, but suggested that funds be borrowed from a bank to carry the corporation along. The suggestion was adopted and the corporation borrowed $150,000 from an Erie bank. Thereafter, because of a continuing decline in business and the need for working capital, a directors meeting was held on March 13, 1954, attended by all five stockholders and directors and a resolution was moved by John E. Britton, seconded by plaintiff Ralph Oboth, and passed unanimously, which read:

"Resolved, that the payment of officers' salaries be deferred until further action of this Board."

From February 1, 1954, by reason of the resolution, and throughout the entire period covered by the complaint, none of the officers or directors of the company, which group, of course, included the three members of the Britton family and the two plaintiffs, received any salaries or dividends.

The evidence shows that from the time the two plaintiffs became associated with the Brittons as general partners, up to and including at least the date April 26, 1954, they were engaged in proprietary functions in relation to the business, first as general partners and then as corporate officers. Plaintiffs were the experienced and practical foundrymen. They had full and complete charge of production and sales. They hired and fired some one hundred seventy production employees. They assumed the general management of all manufacturing phases of the business, including plant design, production lines and the make-up of work schedules. They determined manufacturing costs and prices for which the castings were sold. They interviewed customers and fixed customer delivery schedules. They were on the side of management in negotiating with the union, which had bargaining rights with the partnership and later the corporation. They devoted their full time and energy to the business without regard to any time clock. When the expansion program was undertaken, plaintiffs had at least equal voice with the Brittons in all phases of it. Plaintiffs at all times occupied executive offices. During the period of the partnership and the corporation, withdrawals and dividends were in proportion to ownership, so that the Britton family took no greater percentage of dividends or withdrawals than the plaintiffs. When salary increases were given, plaintiffs received 40% of the increase, which was in proportion to their ownership interest in the partnership and corporation.

*The Factual Situation after April 26, 1954.*

A board of directors meeting was held on April 7, 1954, at which time J. Douglas James was engaged as General Manager. From this time on what had been a cordial relationship between Ray W. Britton and the two plaintiffs deteriorated rapidly. There is sharp controversy as to exactly the functions and duties performed by plaintiffs during the summer and fall of 1954 and whether or not they were superceded by the general manager in their authority in and about the establishment. Plaintiffs, however, continued to occupy the executive offices, to supervise the production and sales and to perform at least most of the functions to the same extent as they did in the partnership days and prior to Mr. James assuming his duties. It is clear, how-

ever, that the Britton family intended that the supervision of the manufacturing end of the business would gradually be taken from the plaintiffs and placed in the hands of the general manager. However, at no time after the meeting of March 13, 1954 did the plaintiffs make any formal demand for the resumption of salaries.

A directors meeting was held September 24, 1954, at which time plaintiffs were re-elected directors but not re-elected as vice presidents. Mr. James was elected as the sole vice president. After this meeting, plaintiffs continued to report for duty and to occupy their offices. They performed practically the same functions as in the past, but all concerned had come to realize that plaintiffs' authority had lessened and that Mr. James was to be the guiding hand in the manufacturing and sales end of the business. By the late fall of 1954, plaintiffs' authority and power in the operation of the business had ended by all intents and purposes and every one connected with the business so understood the situation. The situation became intolerable, with the result that plaintiff Oboth ceased all activities with the corporation on January 30, 1955, and plaintiff Eisert quit on February 18, 1955. At the time that the plaintiffs left the corporation, without question extreme bitterness had arisen between them and the senior Mr. Britton.

Plaintiff Eisert claims the minimum compensation under the Act, plus overtime for the period from February 1, 1954 to February 18, 1955. Plaintiff Oboth claims minimum compensation, plus overtime from January 1, 1954 to January 30, 1955, except for the period April 10, 1954 to June 28, 1954, when he was ill.

*Discussion.*

Plaintiffs' counsel say that two questions are involved, as follows: (1) are plaintiffs entitled to the protection of the Fair Labor Standards Act with respect to minimum pay and overtime, or do they fall without the coverage of the Act either because they were not employees, or were executives? (2) did plaintiffs waive their rights under the Act?

Defendant contends that the plaintiffs, under the evidence, are in no way covered by any of the provisions of the Fair Labor Standards Act and for that reason they are not entitled to any relief in this action.

■ In litigation of this character it is proper to first turn to Section 2 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 202. This section states the Congressional finding and declaration of policy. Section 3 of the Act is 29 U.S.C.A. § 203, which is the definitions section, and paragraph (e) says an " 'Employee' includes any individual employed by an employer." Also, (g) says: " 'Employ' includes to suffer or permit to work." Plaintiffs invoke the general regulations under the Act, 29 U.S.C.A. Appendix, § 541.1, as applied to executive and administrative personnel. Unquestionably these have the force of law where applicable, as many decisions have held. See Stanger v. Vocafilm Corporation, 2 Cir., 151 F.2d 894, 162 A.L.R. 216; also Fanelli v. United States Gypsum Co., 2 Cir., 141 F.2d 216.

In Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 902, 89 L.Ed. 1296, the Supreme Court said:

"The legislative history of the Fair Labor Standards Act shows an intent on the part of Congress to protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce. The statute was a recognition of the fact that due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce. To accom-

plish this purpose standards of minimum wages and maximum hours were provided."

It is noted also that in 324 U.S. on page 707, footnote 18, 65 S.Ct. on page 902, the following appears:

"The legislative debates indicate that the prime purpose of the legislation was to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage."

Each of the parties in this litigation has filed with the court exhaustive briefs with suggested findings and conclusions. It is to be noted that neither side is able to cite any Court of Appeals decision from any circuit deciding a case on comparable facts to those involved in the present case. A decision closest to the one now to be decided is the case of Hoy v. Progress Pattern Company, 121 F. Supp. 371, decided by the United States District Court for the Eastern District of Michigan, which went to the Court of Appeals for the Sixth Circuit, 217 F.2d 701. The district judge concluded in the Hoy case that the stockholder-director-officer plaintiffs were not such employees as were contemplated within the provision of the Fair Labor Standards Act and he dismissed the action. Before the district court it simply appeared that plaintiffs were stockholders, officers and members of the board of directors of the defendant corporation. In reversing the district court and remanding the case for further proceedings, the opinion writer, Judge Miller, used language which this court believes is most important and pertinent in a discussion of the issues presently to be decided. He said in the opinion, page 704:

" * * * In determining the issue in the present case, it is necessary to know and consider all of the facts bearing upon appellants' employment including its origin, the nature and extent of appellants' authority and duties, and the actual relationship existing between them and the dominant stockholders and officers of the appellee corporation, regardless of the titles which were conferred by the corporation upon these workers. In our opinion, there exists such a factual question, shown by the affidavit in opposition to the motion, as prevents this matter being disposed of on the basis of the one affidavit filed in support of the motion to dismiss. The issue, to be raised by a proper pleading, should be fully developed by evidence offered at the time of trial."

An examination of the evidence in this case, bearing upon the matters suggested by the Court of Appeals in the Hoy case, shows:

1. Employment Including its Origin.

In this litigation it need hardly be mentioned that there never has been employment of the plaintiffs by the partnership which preceded the corporation or by the corporation, in the sense which the word "employ" is used in common parlance. Plaintiffs were never hired by any one. They were never engaged to perform services by any one. They commenced their association with Mr. Britton at the time the partnership was formed in 1943. They were equal partners with three other persons. They were proprietors of a prosperous partnership business for a period of four and one-half years. They were working for themselves. The Act of Congress was then in effect, and certainly when the corporation was formed on July 1, 1947, plaintiffs were not "hired" or "engaged" or "employed." They elected themselves officers and directors by virtue of their ownership of stock and by agreement with the other owners. The five partners were the founders of and became the owners of the corporation. They were corporate executives at the top level, in common understanding. They employed other persons, but they themselves represented the proprietary interest as owners of the capital shares of the business.

## 2. Nature and Extent of Plaintiffs' Authority and Duties.

On this phase of the inquiry, it is to be kept in mind that the Brittons were not foundrymen in the sense of being able to supervise and manage the manufacturing end of the business. Plaintiffs had the production know-how and the experience. Mr. Britton offered them a substantial interest in the business as partners. They accepted the offer. Their authority and duties under the evidence clearly indicated ownership and proprietary functions. Such authority and duties continued after the corporation was formed. The expansion program was largely under the direction of the plaintiffs. When controversy and ill feeling arose among the stockholders and officers of the defendant, it was a controversy among owners of a business and not between employer and employee. As time progressed, in the summer and fall of 1954, after the general manager was engaged, unquestionably plaintiffs' authority and duties dwindled, but again it dwindled because the Brittons, being owners of 60% of the stock and therefore in control of the corporation, for one reason or another were dissatisfied with the production management of the corporation by the two plaintiffs. Being dissatisfied with the plaintiffs' management, the dominant shareholders superceded plaintiffs in the operation of the business during the late fall of 1954 and in early 1955. Plaintiffs were not discharged, but the situation having become intolerable, by mutual agreement they simply stopped reporting at the executive offices.

## 3. The Actual Relationship Existing Between Plaintiffs and the Dominant Stockholders and Officers, Regardless of the Corporate Titles held by any of the Parties.

Again, the relationship has its inception in the formation of the partnership. The situation was one common in the business world. Ray W. Britton apparently had financial acumen and plaintiffs had practical experience and know-how.

They teamed up and the result was a prosperous business for the four and one-half years of the partnership existence and for at least two years of the corporate existence. The evidence indicates that the duties and performance of the necessary work in the going concern was divided among the owners under a cordial relationship existing among them. The trouble started when business went bad. Disagreements arose. Yet even when plaintiffs demurred on advancing additional capital to the corporation, the Britton family, owning 60% of the stock, went along with plaintiffs' desire that the working capital be borrowed from a bank rather than be supplied by the owners. There was no domination of plaintiffs by the Brittons until several months after the resolution to waive salaries had been passed. The resolution to forego salaries was unanimously agreed to. There is not a scintilla of evidence to indicate that at the time the resolution was passed plaintiffs were not in full accord with its purpose and the reasons why it was necessary. It was not until the directors meeting of September 24, 1954 that one of the plaintiffs inquired as to when salaries were to be resumed. By that time, it is apparent that the relationship between the elder Mr. Britton and the plaintiffs had so deteriorated that plaintiffs' days with the business were numbered. But again, the argument and discord was on the level of owners and officers of a corporation and not on the level of master and servant.

The result is that when all the factors in the instant case are reviewed, the Court of Appeals decision in the Hoy case indicates that the decision in this case must be that plaintiffs cannot invoke the provisions of the Fair Labor Standards Act. It is noticed that it was not until after plaintiffs had sold their stock to the corporation on August 12, 1955, at twice what it cost them, that plaintiffs indicated that they claimed rights under the Act. Plaintiffs were drawing $1,200 a month each in salary at the time salaries were deferred. Under plaintiffs' view of this evidence, the query is posed

as to what date did plaintiffs become entitled to 75¢ an hour, the minimum wage which for a one hundred sixty hour month would amount to $120, rather than the $1,200 salary which each had previously drawn. It is noted that so far as plaintiffs' overtime claims are concerned, they had always devoted full time and energy to the business without regard to days of the week or the number of hours in any day. At what point did the corporation direct plaintiffs, if they were to be paid overtime compensation, to perform duties over and beyond the forty-hour week? The answers to these questions cannot be found in the evidence. It is, however, certainly correct that if plaintiffs were entitled to the minimum wages and overtime compensation provided in the Act, then they have not waived their right to it. Brooklyn Savings Bank v. O'Neil, supra. See also Watkins v. Hudson Coal Co., 3 Cir., 151 F.2d 311.

It is clear that the plaintiffs were proprietors of the partnership and of the corporation and are not entitled to be both proprietors and employees within the meaning of the Fair Labor Standards Act. To invoke the Act in their favor it was incumbent upon the plaintiffs to sever or terminate in some manner their long continued status as owners of the business. They did not do so at any time during the period for which they claim minimum wages. It is this court's view that there must have been, on the part of plaintiffs, some transformation or some change in status, and that the burden is upon them to establish such a change, because the evidence indicates a bona fide proprietary relationship to the business during the whole of the period in question.

Plaintiff's counsel in their brief concede that plaintiffs were not employees within the provisions of the Act while the business was operated as a partnership. However, plaintiffs' theory is, as the court understands it, that at some point while they were connected with the corporation, plaintiffs became employees within the meaning of the Act. It is noticed that it was not until after plaintiffs had sold their stock to the corporation on or about August 12, 1955, at twice what it cost them, that they indicated that they claimed any rights under the Act. Apparently they had made inquiries at the Pittsburgh office of the United States Department of Labor. A reply from that office by letter dated November 8, 1955 is in evidence. It seems to the court that from the letter plaintiffs acquired a theory which they have adopted and on which they claim and seek recovery in this action. The letter very sketchily reviews the partnership and the inception of the corporation. It then says:

"It would be our position that throughout the course of your employment from the time the organization became a corporation on July 1, 1947 to the date of your dismissal on February 18, 1955, despite any position you may have held as an officer in the corporation, you were employees within the meaning of the Fair Labor Standards Act * * "

It is apparent that the employee of the United States Department of Labor who wrote the letter decided the issue here upon the fact that simply by the formation of the corporation on July 1, 1947, plaintiffs became ipso facto entitled to the protection of the Fair Labor Standards Act. The lawsuit resulted soon thereafter as the complaint was filed January 9, 1956.

If the theory as suggested in the letter and adopted by plaintiffs' counsel is that the formation of the corporation put plaintiffs under the Act, then certainly in the month of January, 1954, when they received their $1,200 salary, they fulfilled both the requirements of Regulation 541.1 and 541.2, relating to executive and administrative employees, both from the viewpoint of performance of duties and by reason of their compensation. Plaintiffs then say that the first of February they could not waive the protection of the Act, but rather than claim executive or administrative salaries, they claim the lowest grade of salary, that is, 75¢ per

hour. Thus plaintiffs reclassify themselves simply because as officers and directors and stockholders, they joined the Brittons in waiving their salaries until further action by the board. Counsel for plaintiffs say that because plaintiffs did not get paid $55 per week, they couldn't be executives. Therefore, they must be entitled to 75¢ per hour and time and a half for overtime. Such a conclusion is naive and unrealistic when applied to the factual situation in this case.

Plaintiffs' counsel have cited many decisions which set forth the requirements for exemption under the statute because either executive under Regulation 541.1, or administrative under Regulation 541.-2. Sun Publishing Co. v. Walling, 6 Cir., 140 F.2d 445; also in the same volume, Walling v. Yeakley, 140 F.2d 830, a decision from the Tenth Circuit; and Helliwell v. Haberman, 140 F.2d 833, a per curiam decision from the Second Circuit.

The difficulty with plaintiffs' contention in this regard is, however, that it is impossible under the evidence to pinpoint any time or date when plaintiffs became transformed from an owner status to that of an employee entitled to wages under the Act. Plaintiffs say if the date isn't February 1, 1954, then possibly it is April 26, 1954, when Mr. James went to work, or as late as September 24, 1954, when plaintiffs were not re-elected vice presidents. At no point in the evidence, however, is it possible to find that plaintiffs changed themselves from top level corporate executives to wage earners. The evidence is not too clear as to exactly why plaintiffs continued reporting at the executive offices as long as they did.

It is noticed with regard to plaintiff Oboth that his counsel in his brief says his reason for continuing to work was his past friendship with Mr. Britton. From Mr. Oboth's testimony it appears probable that the main reason he continued was in the hope and expectation that he would be paid his back salary. It is fair to say that both plaintiffs let the situation drift along from month to month in the expectation that a crisis would be reached and a showdown take place. Such an event did occur and plaintiffs ended their performance of duties for the defendant corporation.

In deciding this case, this court is not unmindful that persons in a similar position to plaintiffs might, under certain circumstances, sever their association with an ownership-officer-director status in a corporation and thereafter become employees, as that term is used in the Act and in common language. However, this court does hold in this case, under the facts presented, that plaintiffs have not shown by a fair preponderance of the evidence that they are entitled to invoke the performance of the Fair Labor Standards Act. This court does not propose to be bound by a decision of an investigator of the Wage and Hour Division of the United States Department of Labor, based on a cursory review of the plaintiffs' background and their association with the partnership and the corporation.

An order will be entered upon all the evidence dismissing the action. This opinion will be regarded as comprising the findings of fact and conclusions of law pursuant to the provisions of Rule 52(a), 28 U.S.C.A.