**WILSON & CO., Inc. v. FREMONT CAKE & MEAL CO.**

Civil Action No. 73—47.

District Court, D. Nebraska, Omaha Division.

March 23, 1948.

Yale C. Holland and Kennedy, Holland, DeLacy & Svoboda, all of Omaha, Neb., for plaintiff.

Maxwell V. Beghtol, J. Lee Rankin, John C. Mason, Kenneth E. Anderson, and Beghtol & Rankin, all of Lincoln, Neb., for defendant.

DELEHANT, District Judge.

In its complaint, the plaintiff, a Deleware corporation, demands judgment against the defendant, a Nebraska corporation, for more than three thousand dollars because of the defendant's alleged breach of a contract for its sale and delivery to the plaintiff of thirty-six tank cars of crude soybean oil, of which thirty cars were admittedly delivered and six cars were allegedly not delivered. The defendant has not yet answered; but before answer day has moved the court for an order under Title 9 U.S.C.A. § 3, to suspend further proceedings in this action pending arbitration in accordance with a provision of the contract which, it contends, requires the parties to submit their controversy to arbitration. It is that motion which, after submission upon the pleadings and certain affidavits, a stipulation, and documentary showings and exhaustive written argument of counsel, now has the court's consideration. It presents several interesting questions.

While the plaintiff challenges the applicability, it does not question the constitutional validity, of The United States Arbitration Act, Title 9 U.S.C.A., or of § 3 thereof relating to the staying of certain proceedings in the courts of the United States, pending arbitration. The denial of the constitutionality of the Act could not at this late date be seriously urged. Marine Transit Co. v. Dreyfus, 284 U.S. 263, 52 S.Ct. 166, 76 L.Ed. 282; Shanferoke Coal & Supply Corporation v. Westchester Service Corporation, 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583; The Anaconda v. American Sugar Refinery Co., 322 U.S. 42, 64 S.Ct. 863, 88 L.Ed. 1117. See also, without present repetition thereof or needless quotation therefrom, Kulukundis Shipping Co. v. Amtorg Trading Corporation, 2 Cir., 126 F.2d 978 for its analysis of the historical development of the attitude towards the arbitration function in English and American jurisprudence.

With the exception of some oblique aspersions in the briefs, the utility and the validity, apart from the congressional mandate, of the arbitration process in general has not undergone discussion. And that is appropriate, for no issue on either of those points is involved in this case. Nor does any appraisal of the virtues or vices of arbitration as such enter into the court's ruling.

The first dispute between the parties is whether there is in their contract any actual agreement to arbitrate. That is one of two primary and equally vital questions presented upon the record. The plaintiff denies that such an agreement was ever made. The contract must, therefore, be examined. It is set out in a footnote.[1]

Without resting any argument upon this factor, the plaintiff directs the court's attention to the verbal parsimony which the contract betrays, and to its execution for both parties to it by a single broker. Upon the latter point it need be said only that both parties to this action adopted the memorandum as their contract, the defendant deliv-

---

[1] "Chicago, 8/10/45

Wilson and Company
Chicago 9

Attn: Mr. B. E. Forssell

The attached confirmation covers transaction consummated today for your account.
We thank you very much for transacting this business through us.

Sincerely,
/s/ Marvin Wood

Telephone State 0350
MARWOOD COMPANY, INC.
221 North La Salle Street
Chicago 1

August 10, 1945                    NO 3447-W

| | |
|---|---|
| Seller | Marr Soybean Processing Company, 130 North Broad Street, Fremont, Nebraska. |
| Buyer | Wilson and Company, Refinery Department, 4100 South Ashland Avenue, Chicago 9, Illinois. |
| Gentlemen: | We confirm transaction today for your account as follows: |
| Commodity | Soybean Oil |
| Quality | Crude |
| Quantity | Thirty six (36) Buyer furnishing tankcars of approximately 61,000 pounds capacity each |
| Weights | Certified |
| Price | Eleven and three-quarters cents (11-¾ ¢) per pound (or O.P.A. ceiling price in effect at time of shipment) f.o.b. Fremont, Nebraska |
| Terms | Sight Draft/Bill of Lading attached for amount of invoice, free of exchange to buyer. Weights & quality guaranteed at destination |
| Shipment { Time | Three (3) tankcars each month October, 1945, through September, 1946 |
| From | Fremont, Nebraska |
| Other Conditions | Seller warrants that crude soybean oil covered by this contract will be produced from beans acquired in accordance with his processor contract with the CCC, or any other government agency controlling the marketing and crushing of oilseeds during season 1945-46. This contract is subject to any governmental regulation controlling the movement and allocation of crude soybean oil. Subject to tankcar regulations by ODT. |
| Rules | National Soybean Processors Association |
| Brokerage | |

This confirmation is made in triplicate, one copy being sent to the buyer, one to the seller, and one retained on file in this office.

Buyer to have privilege of unloading shipments immediately on receipt, seller to be notified by mail of details as to quality and weight adjustment."

Marwood Company, Inc.
As Brokers Only
By Marvin Wood

ered and the plaintiff accepted thirty car loads of oil under it, and the plaintiff's entire complaint rests upon its validity. And, so far as brevity is concerned, it is neither a virtue nor a vice, except as it may disclose or obscure the intent of the makers of an agreement.

The presently significant language of the contract is: "Rules National Soybean Processors Association." Those rules are shown in an exhibit attached to a stipulation in the files, generally entitled: "Year Book and Trading Rules, 1945-1946, National Soybean Processors Association." The trading rules governing the purchase and sale of soybean oil are seventeen in number, identified as Rules 101 to 117, both inclusive.[2] Their text covers some fourteen pages of a printed booklet. Rule 115, dealing with arbitration, is in the following language:

"All controversies arising out of contracts made under these Trading Rules or the breach thereof, unless amicably adjusted otherwise, shall be settled by arbitration in accordance with the Rules, then obtaining, of the American Arbitration Association, and judgment upon the award rendered may be entered in the highest court of the forum, state or federal, having jurisdiction."

Another booklet presented in evidence by the stipulation includes the rules for arbitration of the American Arbitration Association, which are comprehensive and voluminous and provide a detailed program or procedure for arbitration. By the stipulation of the parties upon the submission of this motion, they agree that "they are the rules which would govern the arbitration requested by the defendant herein." Of that procedure, this court now says only that it is obviously operable. Whether resort to it is prudent, or desirable is beyond the proper scope of the present study.

That material includes all of the contractual provisions having any reference to arbitration. From a list of members of the Processors' Association it is shown that the defendant is, and the plaintiff is not, a member of the Association. Not as a part of the contract, but as an item of evidence, the defendant presents two letters to it, one written on December 5, 1946, by the plaintiff through the manager of its refinery department, the other on February 13, 1947, by an attorney in behalf of the plaintiff, whose authority is unquestioned. Both letters demanded delivery by the defendant of the then undelivered six tank cars of oil. The earlier of them, after recalling in detail the contractual basis of the defendant's obligation, contained this paragraph:

"The National Soybean Processors Association Rules, under which this contract was made and under which rules all settlements have been made for the oil you have shipped us, provide for arbitration, but in view of our past satisfactory relations with your company and your principals we certainly do not like to take any steps along this direction until all other means of arriving at an equitable settlement have been exhausted."

The later letter, written by the lawyer opens and closes with the following two paragraphs:

"Wilson & Co., Inc., whom I represent, has referred to me for attention its claim against you for failure to ship six tanks of Crude Soybean Oil as required by and due in accordance with the terms and provisions of the Marwood Contract No. 3437-W, dated August 10, 1945. You are, undoubtedly, familiar with the fact that this contract was made subject to the rules of the National Soybean Processors Association. * * *

"Upon your failure to take such action it is my intention to cause this matter to be submitted and settled by arbitration in the manner provided by Rule 115 of the rules of said National Soybean Processors Association, and thereafter, if necessary, to enforce such an award as contemplated by said rule."

---

[2] To intercept the supposition that the year book contains an awesome number of rules, it may be noted that only the seventeen rules referred to are involved in this case, and that the book's only other rules are seventeen, numbered from 1 to 17 dealing with soybean oil *meal*, with which the instant contract is not concerned. It is the numbering system only that might support the mistaken inference of a confusing multiplicity of rules.

368

■ Upon the history which at this point the action lays before the court, the conclusion that an agreement for arbitration was a part of the contract appears to be imperative. In saying which, the court frankly recognizes that in substantially comparable, though not identical, contexts, other courts have answered negatively the question of the existence of such an agreement.

The negation of the agreement rests heavily upon the history of a single controversy arising under the State Arbitration Law of New York which appeared on several occasions, and in different aspects, in the courts of that state. (1) In the Matter of the Application of General Silk Importing Co., 198 App.Div. 16, 189 N.Y.S. 391; (2) In re General Silk Importing Co., 200 App.Div. 786, 194 N.Y.S. 15, Order affirmed per curiam without opinion, 234 N.Y. 513, 138 N.E. 427; (3) In re Gerseta Corporation, 204 App.Div. 861, 197 N.Y.S. 378 (see also 200 App.Div. 890, 192 N.Y.S. 370). In the interest of brevity the cited opinions will now be referred to by the identifying numbers just assigned to them. In (1) the Importing Company sought an order under the New York Arbitration law, requiring Gerseta Corporation to proceed to arbitration of controversies that had arisen in connection with a contract whereby the Importing Company agreed to sell, and the Gerseta Corporation to buy one hundred bales of raw silk on designated terms. The contract contained the provision that "sales are governed by raw silk rules adopted by the Silk Association of America." One provision of such rules was: "All differences arising between the buyer and seller must be submitted to the arbitration committee of the Silk Association of America." Those rules further contained provisions erecting within the Raw Silk Division of the Association such a committee and sufficiently defining the scope and methods of its operations. The court affirmed an order denying the requested relief but with the reservation of leave to renew the request and held that the contract did not adequately provide for arbitration. In that connection it said:

"The only point here is whether this contract shows with sufficient definiteness that the minds of the parties met on this point, and that they intended to adopt the rules of the Silk Association of America, not merely to insure performance of the contract in accordance with those rules, but that, in the event of a controversy, it should be arbitrated in accordance therewith. The parties could have provided for such arbitration, without setting forth all or any of the rules of the Silk Association of America, if they had merely added, to the provision incorporated in the contract to the effect that the sales are to be governed by those rules, a provision that, in the event of a controversy between the parties, it should be arbitrated as provided by the rules, or if the contract had provided in any manner by appropriate phraseology that the reference to the rules was intended to include those providing for arbitration. That, however, was not done; and since it does not appear that the respondent is a member of the association and it fairly appears that the appellant is, the contract should not be construed as constituting an agreement between the parties to relinquish all right to appeal to the courts for redress under the contract, and to submit to the determination by arbitration under said rules of any claim either of them might have for a breach of the contract."

Actually the court was mistaken in its inference that Gerseta Corporation was not a member of the Association. It was a member; and in consequence of its abstention from the demanded arbitration proceeding, the Association later adopted a resolution expelling it from membership. Thereupon, the litigation noted as (3) ensued, in which Gerseta Corporation sought by mandamus to be restored to its membership upon the theory that its deprivation was without lawful cause. In 200 App.Div. 890, 192 N.Y.S. 370, an order for a peremptory writ of mandamus was reversed. An appeal from the ruling was dismissed by the Court of Appeals. Then, an alternative writ was sought, and in 204 App.Div. 861, 197 N.Y.S. 378, it was held that the alternative writ should issue in the light of the record as it then stood in the controversy, and particularly of the ruling court's finding that there was no obligation on the applicant to submit to arbitration. After

the ruling in 192 N.Y.S. 370, the basic controversy again reached the Appellate Division of the Supreme Court in item (2), upon the renewal of the Importing Company's motion for an order requiring arbitration. On that occasion the court persisted in its ruling and in its negation of the existence of a contract to arbitrate. But it departed sharply from its earlier prescription of the grounds of that conclusion. In the first place it recognized that when the contract was made and, later, when the controversy arose, Gerseta Corporation, as well as the Importing Company, was a member of the Silk Association, and, in apt language nullified its former reference to its supposed nonmembership as a ground of the decision in 198 App.Div. 16, 189 N.Y.S. 391. Then, it found that though both litigants were members of the parent Silk Association, neither was a member of its "raw silk division" in which membership did not follow from membership in the Association. In a meticulous analysis of the history of the Association and the raw silk division within it, and also of the history of the "adoption" or "approval", as the case disclosed, of provisions dealing with arbitration both in the Association's by-laws and in those of the division, it reached conclusions that may be summarized thus: [3]

1. "* * * the rules or by-laws of a division have no binding power or effect upon a member of the association who is not a member of the division, and * * * they may not properly be regarded as the rules or by-laws of the Association."

2. "* * * with respect to the matter of arbitration, the Association has merely provided the machinery for conducting arbitrations which are specially referred to it, and * * * one of the prerequisites was to sign a formal stipulation to arbitrate according to its forms. There is no by-law, provision, or rule of any kind which makes arbitration compulsory upon its members where differences may arise between them."

3. "* * * arbitrations under the raw silk rules are intended to be binding upon the members of the raw silk division, unless there is a special or specific contract to the contrary."

4. When the parent Association approved [4] the rules of its raw silk division, "the rules were 'approved' so far as the raw silk division was concerned, and 'adopted' by the Association in the adjudication of all disputes which *may be referred* to its arbitration committee. It also would seem that when the board approved the raw silk rules, it did not mean that it adopted a rule of arbitration compulsory upon members of the Association." (Emphasis in text.)

Upon the foregoing premises, and in view of the history examined by it, the court, after its tardy recognition of membership in the Association on the part of both of the litigants, declared that "even a member of the Silk Association of America, familiar with the rules of the raw silk division, reading the printed phrase that the sale was 'governed by the rules of the raw silk division', without a specific reference including arbitration, would be justified in thinking that the rules applicable to the sale were intended to relate only to such of the rules as affect the rights and obligations of the parties under the contract, and not to a remedy for enforcing such rights and obligations." Ultimately, therefore, the decision in the controversy was made to rest, as indeed it should have rested, upon the contractual intent of the parties to the agreement as gathered from their language, and appraised in the setting of themselves and of that language. However, it is also to be observed that in appraising that intent, the court reverted to the canon of strict construction of statutes or contracts designed to "oust the court of jurisdiction" (concerning which see Kulukundis Shipping Co. v. Amtorg Trading Corporation, supra.)

Exactly one month after the filing of the opinion last discussed, the same division of the court in Bachmann Emmerich & Co. v. S. A. Wenger & Co., 204 App.Div. 282, 197 N.Y.S. 879, 880, reached a like conclu-

---

[3] Space forbids the detailed reflection of the opinion's labors in reaching these conclusions.

[4] The court had already stated that the term "adopted" was inaccurately used, and should be understood as "approved" (vide supra).

sion upon an application for an order requiring arbitration of a controversy arising under a contract in which the pertinent language was: "Sales governed by raw silk rules adopted by the Silk Association of America." The decision was premised explicitly upon the General Silk Importing Co.-Gerseta Corporation rulings. Summarizing which, the court said, "In those cases it was held that the provisions of a statute which sought to oust the court of jurisdiction, should be strictly construed, and it was further held that the provision of the contract that the sales should be regulated by the rules of the raw silk division should not be interpreted as including the rules of such association providing for the settlement of differences between the parties upon sales."

Western Vegetable Oils Co. v. Southern Cotton Oil Co., 9 Cir., 141 F.2d 235, is the federal court decision chiefly relied upon by the plaintiff in its negation of an agreement for arbitration. It arose upon an appeal from an order of the district court for the Southern District of California denying a motion by the defendant Western Company for a stay pending arbitration. The order was affirmed. Southern Company, the buyer, had sued Western Company, the seller, and a railway carrier for damages due to failure to deliver a tank car of cocoanut oil, which the seller had delivered to the carrier pursuant to a contract of sale. The oil for which the buyer had paid was lost in transit. The written contract contained what was called a "clause paramount" providing that "this contract is subject to the published Rules and Regulations of the National Institute of Oilseed Products—and which are hereby made a part of this contract, except insofar as such Rules and Regulations are modified or abrogated by this contract." One of the Institute's rules (of which there were one hundred fifty-two) provided: "Any dispute arising under contracts which can not be settled amicably shall immediately be submitted to arbitration before a committee selected by the San Francisco Chamber of Commerce under the Rules of the National Institute of Oilseed Products." California, which was the state where the contract was made and to be performed (as its terms declared) and whose laws were contractually adopted by the parties, had a statute essentially indistinguishable from Title 9 U.S. C.A. § 2. So, no question of conflicts was present. The buyer was not a member of the Institute. Evidently the seller was. The contract was prepared on a printed form devised by the seller. Interestingly, during presuit negotiations for adjustment of the buyer's claim, the seller's president had suggested that "arbitration might be the sensible thing," thus inviting an inference that he was initiating a novel proposal, not invoking an existing contractual right. The circuit court of appeals, in its majority opinion, adverted to In re General Silk Importing Co., 198 App.Div. 16, 189 N.Y.S. 391, (but without reference to or consideration of the later phases of that litigation), and dallied briefly with the temptation to hold that the agreement to arbitrate was inadequately expressed in the contract before it. But that impulse was rejected in this express language [141 F.2d 237]: "But we do not rest affirmance upon the ground that the intention to arbitrate possible disputes was not plainly expressed, for the record contains internal evidence tending to negative such an intention." And that evidence was the fact that, while the sale contract followed a uniform general contract embodied in one of the Institute's rules so closely as to persuade the court that it was actually prepared from the Institute form, the "clause paramount" in the contract before the court (quoted above) exactly reproduced only the opening language of that designated clause in the uniform contract, but altogether and significantly omitted this language: "and any dispute arising under this contract shall be settled by a Board of Arbitration selected by the San Francisco Chamber of Commerce and to be judged according to the rules of the National Institute of Oilseed Products, and the findings of said Board shall be final and binding upon all the signatories hereto." The majority of the court (two members) were persuaded that such omission was deliberate and purposeful, and evidenced an intention to abstain from any agreement to arbitrate. Senior Judge Wilbur dissented upon the express ground that the alleged agreement

for arbitration was effectively embodied in the contract. Rejecting the majority position touching the omission of a part of the form of "clause paramount" he said: "the contract * * * made the rules of the National Institute of Oilseed Products a part of the contract of sale. The rules provided for an arbitration of disputes arising under the contract. * * * This claim clearly arises out of the contract and, consequently, is subject to the agreement to arbitrate."

The Western Vegetable Oils Co. case and the Silk Association cases were cited in Application of Pacific Vegetable Oil Corporation, Cal.App., 166 P.2d 31, 36, in support of a statement by the California District Court of Appeal to the effect that "there is substantial authority supporting their claim that the language of the contract is not sufficient to bind them to arbitration under the rules of the Foreign Trade Association." The language in question was, "This contract is subject to published rules of the Foreign Commerce Association of the San Francisco Chamber of Commerce except insofar as these rules may be abrogated by special conditions written into this contract." And certain rules of the Association erected an arbitration procedure. However, the case before the California court was in such posture that the adequacy of the underlying contract to provide for arbitration was not, and could not be, in issue. And the court expressly abstained from passing upon it, and declared that any question of that sort had already been foreclosed by an earlier and unappealed judicial order directing arbitration, pursuant to which an award had been made. Its determination was limited to the regularity of certain steps and actions in the arbitration procedure itself, and did not extend to the adjudicated issue whether the award might properly have been compelled, much less to the question whether a civil court might appropriately have stayed an action before it pending arbitration.

Even though the rulings of the intermediate appellate court of New York and of the majority of the judges sitting in the United States circuit court for the ninth circuit [5] were directly in point and decided the precise issue now before this court, they would not be controlling in the present instance. They would be entitled to respectful consideration, especially to the extent that their reasoning might be found consistent and persuasive, but to no more than that. They have received that consideration. But they appear to be both factually distinguishable and demonstrably indecisive so far as the issue directly presented here is concerned.

The New York litigation, in its final phase, was resolved upon the construction of the Silk Association's rules and those of its raw silk division in such fashion that contracting members of the Association, (who were not also members of its raw silk division) including the litigants before that court, would not understand them to provide for arbitration. And in the ninth circuit case, there was an express refusal, even by the majority of the court, to adopt the conclusion to which this court is presently invited, and a resort to language embodied in, and to an expression omitted from, the contract which, in the estimation of the deciding majority, repelled the supposition of an intention to provide for arbitration. So the objective of the search of both of those courts was the understanding and intent of the contracting parties as gathered from their language and such other illuminating evidence as was available. And that is this court's prime inquiry.

No difficulty is encountered, in affirming an agreement to arbitrate, in the single circumstance that the plaintiff is not a member of the Processors Association. While the ninth circuit court noted a like situation, that did not control its decision. And the New York court finally made a confused retreat from its earlier reliance, in observable measure, upon that factor, when it discovered the factual error in its supposition of nonmembership. No consideration leads this court to deny the right, or the conceivable and intelligible willingness, of the plaintiff, obviously an extensive user of soybean oil and dealer with the soybean

---

[5] Application of Pacific Vegetable Oil Corporation, Cal.App., 166 P.2d 31 may be put aside as wholly inapposite.

trade, to make itself amenable to the Association's trading rules in that product, in the execution of its contracts to acquire the oil. In that relation, it deals with a specialized field of industry and may well desire to orient its contracts to the standardized experience of the trade. And that extends to the use of the arbitration facility, especially since it is not the work of a department of the Association itself, but rather the service of an independent agency.

The adopted broker's memorandum identifies the Association's rules. It is not seriously questioned that the effect of that identification in its context is the incorporation of the oil trading rules as the governing standards of the sale pursuant to the otherwise incomplete memorandum. Now, one of those rules expressly and unequivocally provides for arbitration of "all controversies arising out of contracts made under the rules or the breach thereof, unless amicably adjusted otherwisee" in accordance with the rules of the American Arbitration Association. And the latter rules, as has already been noted, include an arbitration program and technique, whose intrinsic adequacy is not challenged upon this submission. What ingredient of agreement is omitted? Not certainty of content, for every requisite of certainty may be discerned. Id certum est quod certum reddi potest. The memorandum exactly identifies the rules of the Association; and one of them provides for arbitration and, by reference to the rules of the Arbitration Association, for its machinery. Of these things the parties must be considered to have known when they accepted the deal reflected in the memorandum. There is no single word or shred of evidence which even suggests that both—or either—of them did not.

Confirmation of that inference of understanding, at least by the plaintiff who alone questions the meeting of minds, is affirmatively present in this instance in the letters written by or in behalf of the plaintiff after time for performance, but in an effort to induce or press the defendant to final performance. It was the plaintiff who first asserted the right to, and obligation of, arbitration if the putative default were persisted in. At this point, the court makes it clear that the letters are not regarded as an instance of the practical construction of the contract by the parties. Nor are they effective as an estoppel. No factors working an estoppel are present. But they are instructive upon the vital question of the understanding by the parties, at least by the plaintiff, of the reach of the agreement. They go to the controlling issue of contractual intent. And whereas, in each of the Silk Association and Vegetable Oil Association cases, collateral circumstances existed which were allowed to despoil otherwise simple language of its contractual consequence, here the letters are somewhat striking testimony in fortification of the obvious contractual effect of uncomplicated terms.

If it be urged that the undertaking to arbitrate is a large consequence of the meagre phrase, "Rules: National Soybean Processors Association," that so much should not be understood from so little, the sufficient answer is that the parties (including the plaintiff) accepted—even if they did not choose—the words; that a part of their scope included the arbitration clause; that no relationship, event, or circumstance nullifies, or even questions, the natural assumption that they knew the significance of their language; and that the evidence before the court rather confirms such understanding.

The plaintiff argues that the parties should be held, by their adoption of the Association's rules, to have submitted only to those of the rules which have to do with standards of quality, price, unit of weight terms, time of shipment, weights, routing, tank cars, etc. (except as controlled in the memorandum), but not to the rule requiring arbitration. Qua auctoritate? The court may not lend its sanction to such postcontractual eclecticism, especially since it is invoked unilaterally.

This court considers that there is much virtue in Judge Wilbur's understanding of the reach of the basic contract involved in the cited ninth circuit case in which he dissented. And it is also to be observed that, apart from their view of the consequence of the seemingly purposeful omission from the contract of a part of the "clause paramount" from the otherwise util-

ized standard contract, his brethren of the court were unwilling to advance a different view of the contract or to declare it otherwise to be too vague and indefinite to sustain the inference of an agreement to arbitrate. It may be noted also that no like distinction may be made here, since the Soybean Processors Association suggested form of standard agreement was not used at all by the parties to this case.

One final thought before proceeding to a further contention. The plaintiff urges, as did the New York court in its first and somewhat discredited opinion (see quotation, supra), that the parties to the present contract might have manifested their agreement to arbitrate by a short and simple paragraph in the memorandum explicitly declaring such a purpose, or by a clause to the effect that, in adopting the association's rules, they intended to adopt Rule 115 dealing with arbitration. To this court, such a position seems utterly untenable. If any of the rules were *not* to be operative their omission ought, indeed, to have been expressly incorporated into the memorandum by appropriate language. But having adopted by adequate descriptive language the entire group of rules, the addition of such a phrase as, "and we intend to include Rule 115", would appear to be the ultimate in supererogation.

The plaintiff's second position of major significance is that, even if the agreement to arbitrate be granted, or found to have been made, Title 9 U.S.C.A.,[6] in its entirety, and Section 3 thereof in particular, are inapplicable in this case. The argument in support of that view rests upon two associated propositions. The first of these is that the contract between the parties is not one "evidencing a transaction involving commerce" within the meaning of Title 9 U.S.C.A. §§ 1 and 2; and the second is that, if the first be allowed, then Title 9 U.S.C.A. § 3 may not be resorted to by either party in an action for recovery of damages for violation of the contract.

In support of its denial that the transaction between the parties involved commerce, the plaintiff, without the aid of authority, argues that the specification of a price, "f. o. b. Fremont, Nebraska," means that delivery was to be completed and the contract fully executed by performance in

---

[6] Sections 1, 2, and 3 of Title 9 U.S. C.A. are as follows:

"§ 1. 'Maritime transactions' and 'commerce' defined; exceptions to operation of title

" 'Maritime transactions,' as herein defined, means charter parties, bills of lading of water carriers, agreements relating to wharfage, supplies furnished vessels or repairs to vessels, collisions, or any other matters in foreign commerce which, if the subject of controversy, would be embraced within admiralty jurisdiction; 'commerce,' as herein defined, means commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce. July 30, 1947, c. 392, § 1, 61 Stat. 669.

" § 2. Validity, irrevocability, and enforcement of agreements to arbitrate

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. July 30, 1947, c. 392, § 1, 61 Stat. 669.

"§ 3. Stay of proceedings where issue therein referable to arbitration

"If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration. July 30, 1947, c. 392, § 1, 61 Stat. 669."

Nebraska; and, on that account, no interstate commerce was involved.[7]

The contract, however, has certain other provisions indicative of an operation in interstate commerce. Among these are "TERMS: Sight Draft Bill of Lading attached for amount of invoice, free of exchange to buyer. Weights & quality guaranteed at destination"; "Shipment from: Fremont, Nebraska." "Other Conditions: Subject to Tankcar regulations by ODT;" "Buyer to have privilege of unloading shipments immediately on receipt, seller to be notified by mail of details as to quality and weight adjustment." And the Association's rules contain several provisions contemplating the movement in interstate commerce of the product sold. Then the seller's address is specified as Fremont, Nebraska, and that of the buyer as Chicago. And the memorandum was ostensibly made in Chicago.

It is believed that the symbol "f. o. b." in its present context will not carry the burden which the plaintiff would impose upon it. It is true that, in particular settings, it has frequently been construed to fix a place of delivery, either absolute or conditional. But in many others, and especially where inspection at destination with rejection rights, verification and adjustment of price after transportation, and other similar actions were contemplated, the expression has been held only to fix the price and the incidence of transportation costs. Southern Pacific Co. v. Hyman-Michaels Co., 63 Cal. App.2d 757, 147 P.2d 692; Boss v. Hutchinson, 182 App.Div. 88, 169 N.Y.S. 513; Early-Foster Co. v. A. P. Moore's Sons, Tex.Civ.App., 238 S.W. 299; Partin v. Hawkins, Tex.Civ.App., 257 S.W. 571; Craig Brokerage Co. v. Joseph A. Goddard Co., 92 Ind.App., 234, 175 N.E. 19; Lee v. Northway Motor Sales Co., R.I., 121 A. 425.

In very similar circumstances, and in application of Title 9 U.S.C.A. § 3, a contract was held to involve commerce in Shanferoke Coal & Supply Corp. v. Westchester Service Corporation, 2 Cir., 70 F.2d 297, 299. Upon that point the court in that case said: " * * * the contract 'involved commerce' as defined by section 1. The seller, the plaintiff, was to ship the coal on cars f. o. b. Pennsylvania, consigned at the buyer's directions, and, since the buyer's place of business was Yonkers, the 'commerce' concerned was between the states."

Appraising the contract in its entirety, the court is of the opinion that it does evidence "a transaction involving commerce." And if that view be correct the plaintiff's negation of the applicability of Title 9 U.S.C.A. § 3 necessarily fails.

But, if the court be mistaken in the conclusion just stated, the question remains whether the mandatory stay provisions of Title 9 U.S.C.A. § 3 are applicable to an action properly instituted and pending in a United States district court, whose jurisdiction is unquestionable, upon a contract which does not evidence a transaction involving commerce. It has been the subject of several considered opinions. But it may not be said that they disclose either unanimity, or an unanswerably convincing numerical preponderance, of conclusion.

The denial in some of the cases of the availability of Section 3 rests chiefly upon two facts. The first is that the title of the Arbitration Act (of which Section 3 is a part) is "An Act To make valid and enforceable written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the States or Territories or with foreign nations."[8] Concerning that title it is argued that the reference to maritime transactions or commerce among the states, etc. limits and qualifies the word, "contracts" in every aspect of the act, including its provisions in Section 3 touching procedure in the District Courts.[9] The second is that the definitions in Section 1 and

---

[7] In its brief the plaintiff states that "by its agreement the defendant agreed to deliver to the plaintiff 36 cars of soybean oil f. o. b. Fremont, Nebraska." By that language it does not quote from, but rather offers its construction of, the language of the contract. The words "f. o. b. Fremont, Nebraska" in the contract are used only in association with the specified price. See copy of contract, footnote 1, supra.

[8] Act of February 12, 1925, 43 Statutes. at Large 883.

[9] It may be noted with interest, however, that the phraseology and punctuation of the quoted title do not necessarily

the validating provisions of Section 2, first define maritime transactions in the usual way, and commerce as including broadly interstate and foreign commerce; and, thereafter, limit the validating legislation to maritime transactions and contracts evidencing a transaction in commerce as thus defined. That premised, the argument proceeds to insist that the limitations of Sections 1 and 2 are necessarily implicit in Section 3, notwithstanding the latter's sweeping and unrestricted phraseology, see. footnote 6, supra, for copy.

The affirmation of the availability of Section 3 to actions arising under contracts containing provisions requiring arbitration, whether they evidence transactions involving commerce or not, stands squarely upon the unqualified language of Section 3 itself, and upon the proposition that whatever limitation may exist upon the power of the 'congress to legislate in respect of the substantive validity of private contracts, its power to control the jurisdiction and usages in the inferior federal courts is not also thereby restricted. And the advocates of that position insist that the congressional regulation of those courts issues from a separate constitutional provision,[10] unrelated to the commerce clause, and is not limited or affected by the latter grant of power. Certain of the cases supporting this broad view of the coverage of Section 3 are careful to point out the contrasting restriction of the availability of Section 4 under which, within prescribed jurisdictional limits, the authority is conferred upon District Courts to compel arbitration pursuant to agreements to that end.

The courts within the eighth judicial circuit have apparently not had occasion to pass directly upon the question. In Transcontinental & Western Air Inc. v. Parker, 8 Cir., 144 F.2d 735, the court affirmed an order theretofore entered by Judge Reeves in Parker v. Transcontinental & Western Air Inc., D.C.W.D.Mo., 55 F.Supp. 240,

denying a motion for a stay pending arbitration in pursuance of Title 9 U.S.C.A. § 3, in an action to recover certain death benefits provided by an employment contract, brought by the widow of an employee of the airline corporation in whose contract a provision was included for the reference of "all disputes between Employer and Employee concerning questions of fact arising under this contract." But the ground of the decision, both in the trial court and on appeal, was that the only dispute involved was not between the employer and the employee, but rather between the employer and the plaintiff as the employee's widow. It is quite true that Judge Reeves, adverting to Section 3, recognized that the courts had construed it "to be broad enough to affect all cases in the federal court where suits are founded upon contracts containing provisions for arbitration". [55 F.Supp. 241.] But that observation was rather preliminary to, than the essence of, his decision.

Nor, within the precise area of this controversy, has the Supreme Court of the United States directly announced its views. Some language in Shanferoke Coal & Supply Corp. v. Westchester Service Corp., 293 U.S. 449, 55 S.Ct. 313, 79 L.Ed. 583, is referred to later herein. But it is regarded as only suggestive, rather than determinative, of the court's attitude upon the matter now under study.

The plaintiff cites and relies, in this connection, upon Gatliff Coal Co. v. Cox, 6 Cir., 142 F.2d 876; Zip Manufacturing Co. v. Pep Manufacturing Co., D.C.Del., 44 F. 2d 184; and In re Cold Metal Process Co., D.C.W.D.Pa., 9 F.Supp. 992.

The Gatliff Coal Co. case holds that the following language of Title 9 U.S.C.A. § 1: "but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," constitutes a limitation upon

---

compel the limitation of the word, "contracts," by the phrase "maritime transactions, or commerce among the states," etc. The time may very reasonably—and it may be argued that it must necessarily—be understood as referring to *written provisions or agreements for arbitration of disputes arising out of* (1) contracts, (2) maritime transactions, or (3)

commerce among the states, etc. Thus, broadly interpreted, the procedural direction of Section 3 in its sweeping language is clearly within the range of the title. See discussion in Donahue v. Susquehanna Collieries Co., D.C., 3 Cir., 138 F.2d 3, 5, 149 A.L.R. 271.

[10] Constitution, Article 3, Section 1.

the operation of Section 3 of the Act. The opinion seems clearly to support the view contended for by the plaintiff. So also does the more recent case of Tejas Development Co. v. McGough Bros. 5 Cir., 167 F.2d 268, in which the court refused to apply the provisions of Section 3 in an action brought upon a contract involving the grading of streets and the building of houses in Texas; and studied and applied the domestic law of Texas upon the extent to which local agreements for arbitration are enforcible in the courts of that state.

The other reported cases sustaining the plaintiff's view are District Court opinions. In Zip Manufacturing Co. v. Pep Manufacturing Co., D.C.Del., 44 F.2d 184, the court refused to stay trial, pending arbitration pursuant to an agreement therefor, of an action for infringement of a patent. The agreement for arbitration was contained in a contract under which the parties had adjusted an earlier infringement controversy arising out of the same patent. The court based its ruling upon the view that since the contract and controversy between the parties before it did not involve a maritime transaction or commerce, the provisions of Section 3 were inoperative. In re Cold Metal Process Co., D.C.W.D.Pa., 9 F.Supp. 992, arose, under Section 4 rather than Section 3, as a proceeding for the appointment of arbitrators incident to a dispute arising out of a contract granting a license for the exclusive manufacture, use and sale of certain patented appliances. The court denied the request upon the ground that the relief allowable under either Section 3 or Section 4 is limited to cases involving contracts within the definition of Section 1 and the validating provisions of Section 2. In Karno-Smith Co. v. School District of Scranton, D.C.M.D.Pa., 44 F.Supp. 860, a like result was reached in a case arising out of a contract for the construction of a school building. Somewhat later, in Donahue v. Susquehanna Collieries Co., D.C.M.D.Pa., 49 F.Supp. 843, an action to recover unpaid overtime compensation and liquidated damages under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., another judge of the same district followed the same theory in denying a motion to suspend proceedings pending agreed arbitration.[11] That case is highly comparable both in facts and in result to the Gatliff Coal Co. action.

It will readily be observed that all of the cases discussed in the last preceding paragraph arose in District Courts within the third judicial circuit. Donahue v. Susquehanna Collieries Co., supra, was appealed to the Circuit Court of Appeals of that circuit, which directly reversed the ruling of the District Court. And, in the course of its reasoning, it adverted to the Zip Manufacturing Company, Cold Metal Process Company, and Karno-Smith Company cases, and declined to follow them. See Donahue v. Susquehanna Collieries Co., 3 Cir., 138 F.2d 3, 6, 149 A.L.R. 271, more extensively discussed, infra. The authority of those district court cases is, therefore, substantially minimized, if not entirely nullified.

In Donahue v. Susquehanna Collieries Co., 3 Cir., 138 F.2d 3, 5, 149 A.L.R. 271,[12] the Circuit Court of Appeals for the third circuit analyzed the relation of Sections 3 and 2 of the Arbitration Act in this language:

"The title of the Act suggests, though of course it does not compel, the conclusion that the provisions of the statute are applicable to three kinds of things: (1) Contracts, (2) maritime transactions and (3) commerce, interstate and foreign. The first section defines maritime transactions and commerce. Then the second section proceeds to lay down a rule of substantive law regarding the validity of an agreement for arbitration in case of any maritime transaction or a contract evidencing a transaction involving commerce. Congress was here making a rule concerning subject matter within its own constitutional legislative authority. It was not seeking to confer

---

[11] And see Application of Susquehanna Collieries Co., D.C.M.D.Pa., 49 F.Supp. 845, in which, on the same day, the court denied relief under Section 4 upon the same controversy, but in a separate action.

[12] See also Donahue v. Susquehanna Collieries Co., D.C.M.D.Pa., 66 F.Supp. 588; and Donahue v. Susquehanna Collieries Co., 3 Cir., 160 F.2d 661, for further and subsequent history of the controversy, which has no direct present pertinence.

validity to arbitration agreements generally, a matter outside the scope of federal powers. Instead it picked out two important classes of transactions within the federal legislative domain and declared the effect of arbitration clauses in agreements concerned therewith.

"Then in § 3 the statute deals with the conduct of suits in federal courts, again a subject matter of congressional power. The language becomes general: 'any suit or proceeding', upon 'any issue referable to arbitration under an agreement in writing for such arbitration' are the words. Congress is not limited, in legislating as to law suits in federal courts, to those suits involving matters where the substantive rights of the parties may be controlled by federal legislation. The generality of the language used in the statute does not suggest any self-imposed limitation. Nor do we think that the 'congressional approval of arbitration' should be so limited by implication, by a grudging type of construction carried down from the days of judicial hostility to all arbitration agreements. We think it clear that the provisions of § 3 are not to be limited to the specific instances dealt with in § 2."

Some two years later, and after its earlier ruling had been both criticised (Gatliff Coal Co. v. Cox, supra) and followed (Agostini Bros. Building Corporation v. United States, 4 Cir., 142 F.2d 854), the court for the third circuit, in Watkins v. Hudson Coal Co., 3 Cir., 151 F.2d 311, reexamined and reaffirmed its position in the Donahue case. Upon that phase of the Watkins case, one judge dissented. He had not participated in the Donahue case. Actually, and considering the two cases, four judges of that circuit (in addition to a district judge concurring in the Watkins prevailing opinion) have adhered to the majority position, as against the single dissent. Certiorari was denied, 327 U.S. 777, 66 S.Ct. 522, 90 L.Ed. 1005, as was also a rehearing on that ruling, 327 U.S. 816, 66 S.Ct. 701, 90 L.Ed. 1039. This court attributes no unwarranted significance to those rulings of the Supreme Court, though it may be mentioned that they occurred in reference to a case in which a sharp and lucid dissent had been recorded in the circuit court.

It may be noted that after the announcement of the cited ruling of the Circuit Court of Appeals for the third circuit in the Donahue case, the District Court for the middle district of Pennsylvania followed that ruling, and stayed proceedings pending arbitration in Evans v. Hudson Coal Company, D.C.M.D.Pa., 71 F.Supp. 152, and also in Watkins v. Hudson Coal Company, D.C.M.D.Pa., 54 F.Supp. 953, affirmed as modified 3 Cir., 151 F.2d 311, supra.

In Agostini Bros. Building Corporation v. United States, 4 Cir., 142 F.2d 854, the Circuit Court of Appeals for the fourth circuit, in a suit arising out of a contract for the construction of a government building, reversed an order of the District Court denying a motion to stay proceedings pending arbitration in accordance with an agreement incorporated into the construction contract, and in a considered opinion, adhered to the view that the relief by way of stay provided in Section 3 of the Arbitration Act is not limited to cases within the provisions of its Sections 1 and 2.

The District Court for the Eastern District of Wisconsin, in Pioneer Trust & Savings Bank v. Screw Machine Products Company, D.C.Wis., 73 F.Supp. 578, after examining most of the reported opinions dealing with the question, stayed proceedings pending arbitration in an action to recover royalties under a license agreement and held that the power of the court to grant such a stay under Title 9 U.S.C.A. § 3 was not limited by Sections 1 and 2 of the title.

The defendant argues that the Circuit Court of Appeals for the second circuit has adhered to the position that Title 9 U.S.C.A. § 3 is unlimited by the language of Sections 1 and 2 of the title. This court is not prepared to assent, with confidence, to that appraisal of the cases arising in the second circuit. It is quite true that such a conclusion would harmonize with and be fortified by that circuit court's discussions of closely related questions; [13] but it would not

---

[13] See analysis in Donahue v. Susquehanna Collieries Co., 3 Cir., 138 F.2d 3, 6, 149 A.L.R. 271, and Agostini Bros. Building Corporation v. United States, 4 Cir., 142 F.2d 854, 857.

seem imperatively to follow from them, or at least from matters of decision strictly understood, as distinguished from dictum.

The case of Shanferoke Coal & Supply Corp. v. Westchester Service Corporation, 2 Cir., 70 F.2d 297, 298, arose out of a contract involving commerce, namely the shipment of coal on cars f. o. b. Pennsylvania consigned at the buyer's directions (see comment and quotation, supra), and containing an agreement for arbitration. The granting of a stay was resisted because the contract, interpreted as the plaintiff insisted and the court conceded arguendo, contemplated the conduct of the arbitration only in the state courts of New York, thereby making resort to section 4 of Title 9 unavailable. The District Court had denied the stay; but the Circuit Court of Appeals reversed its ruling and held that resort to the stay provision of Section 3 was available even though compulsory arbitration might not be obtainable under Section 4. And by way of dictum the court discussed the particular point now under examination in this language:

"In The Volsinio, supra, D.C., 32 F.2d 357, the actual ruling was that although this was true, the section was inapplicable, unless the contract was itself 'maritime', or 'involved commerce', as defined, by section 1 of the act (9 U.S.C.A. § 1). We are not clear that this is true; section 2 defines those contracts which it makes 'valid, irrevocable and enforceable,' and no doubt such alone are within section 4. Krauss Bros. Lumber Co. v. Louis Bossert & Sons, 2 Cir., 62 F.2d 1004. But it does not follow that section 3 is so circumscribed; the language is: 'If any suit * * * be brought * * * upon any issue referable to arbitration under an agreement * * * for such arbitration.' 'Such arbitration' may very well refer back to 'any issue referable to arbitration,' and not to section 2. The change in language from section 5 of the New York Arbitration Act, from which, in general, section 3 of the federal act was copied, was plainly deliberate. In the New York act the clause had read, 'under a con-

tract * * * described in section two,' and section 2 of that act was the analogue of section 2 of the federal act (9 U.S.C.A. § 2). 'Such arbitration' was very awkward as an equivalent for all that is comprised in section 2 of the federal act, and suggests a broader intent."

The availability of the stay procedure under section 3 notwithstanding the unavailability of the compulsory relief accorded in Section 4 was reaffirmed in Re Pahlberg Petition, 2 Cir., 131 F.2d 968, and Kulukundis Shipping Co. v. Amtorg Trading Corp., 2 Cir., 126 F.2d 978, 987.

It has been suggested [14] that In re Woerner, 2 Cir., 31 F.2d 283, is authority for the proposition that the granting of a stay under Title 9 U.S.C.A. § 3, is limited to cases within the scope of the earlier sections of the title. But that is a mistaken inference. In re Woerner merely decided that, regardless of an agreement of parties to a contract, a Federal District Court is without jurisdiction to enter judgment upon an arbitrator's award, unless some valid statutory ground of the court's jurisdiction is present; in other words that Title 9 U.S.C.A. § 3 does not enlarge the district court's jurisdiction over actions.[15] See analysis to this effect in American Guaranty Co. v. Caldwell, 9 Cir., 72 F.2d 209, 211.

Dealing specifically with relief under Section 4 of the Act, the court, in San Carlo Opera Co. v. Conley, D.C.N.Y., 72 F.Supp. 825 (upon the authority of Krauss Bros. Lumber Co. v. Louis Bossert & Sons, 2 Cir., 62 F.2d 1004 and Shanferoke Coal & Supply Corporation v. Westchester Service Co., supra), held that orders to proceed to arbitration are allowable only in cases within the definitions of Section 1 and the validating provisions of Section 2 of Title 9. But it expressly excepted the stay provisions of Section 3 from the reach of its decision. The ruling was affirmed by a per curiam memorandum adopting the district judge's opinion. Conley v. San Carlo Opera Co., 2 Cir., 163 F.2d 310.

So far as the authorities cited by counsel, or within this court's information, extend,

---

[14] See San Carlo Opera Co. v. Conley, D.C.N.Y., 72 F.Supp. 825, 829.

[15] The controversy in Re Woerner involved the attempt to enforce an award

of arbitrators, in a sum less than $3,000.00 and was between citizens of the same state.

the thought of the court of the second circuit upon the exact question being considered is reflected only in dictum and, therefore, is no more than tentatively determinable.

■ Considering the several reported opinions upon the issue, and especially the statute itself, this court, by way of conclusion, is inclined to the opinion that the stay provisions of Section 3 are not limited to cases resting upon maritime transactions or upon contracts evidencing transactions involving commerce. The indecisiveness in this connection of the title of the Act has already been mentioned. But the persuasive factor in the court's estimation is the unlimited language of Section 3 itself. It contains no qualifying phrase or phrases. It makes no reference to the other carefully circumscribed sections of the Act.

Accordingly, upon both of its subsidiary supporting bases, the court rejects as meritless the second substantial ground of objection by the plaintiff, and holds that the stay provisions of Title 9 U.S.C.A. § 3 are applicable to this case, arising as it does under the contract sued upon.

■ A brief observation may be made at this point upon a question mentioned by the parties in relation to the issues thus far discussed. The question is the degree of strictness or liberality with which, first, the contract of the parties, and, secondly, the language of Title 9, Sections 1, 2, and 3, should be appraised by the court in the present ruling. The court has felt that, in each instance, the language studied, in its clear and natural significance, leads to the conclusion already announced in respect of it, without either choleric narrowing or enthusiastic amplification. In appropriate situations, both strict and narrow constructions of language have their respective uses and places. But when identifiable words have a plain and obvious significance, that ought usually to be accepted as their meaning. All too frequently, resort to the expedient of strict or liberal construction, as the case may be, is a device to introduce judicial inclination into the analyzed language, rather than to present the language to the objective judicial mind.

There remain certain points urged by the defendant, whose solution may be announced very briefly.

■ To the contention that the laws of Nebraska upon the subject of agreements to arbitrate apply, it may be answered that, if, as the court has already concluded, the parties have agreed upon arbitration and the case is one in which Title 9 U.S.C.A. § 3 applies, then the issue is one of procedure, not of substantive right, and Nebraska's laws are neither controlling nor even instructive. Marine Transit Corporation v. Dreyfus, 284 U.S. 263, 52 S.Ct. 166, 76 L. Ed. 282; Kulukundis Shipping Co., v. Amtorg Trading Corporation, 2 Cir., 126 F.2d 978; Murray Oil Products v. Mitsui Co., 2 Cir., 146 F.2d 381. In that connection, the plaintiff had—perhaps, still has—the absolute choice of forums for the recovery of the damages it claims, beyond the possible interferance of the defendant. That reflection does not enter into the ruling upon the point; but it obviates the suggestion that the procedure that is made mandatory in this court is being imposed upon a litigant brought here against its will and thereby deprived of the supposed advantages to it of the state court's traditional usages, which are unaffected by Title 9 U.S.C.A. § 3.

■ Then, it is contended that there is nothing in the case upon which arbitration may be had, that the only possible issue is the amount of damages. The plaintiff may consider—may even know—that contention to be true. But at this point in the pleadings, the court may not assume that it is. It can not yet be known, with assurance, what issues will be raised by the defendant's answer. But even if the plaintiff's theory be factually accurate, and nothing is involved but damages, that question is arbitrable. Shanferoke Coal & Supply Co. v. Westchester Service Corporation, 2 Cir., 70 F.2d 297, Kulukundis Shipping Co. v. Amtorg Trading Corporation, 2 Cir., 126 F.2d 978. And the present contract expressly provides for the arbitration of all controversies arising under it, if this court's earlier analysis of it be correct.

■ It is also charged that, within the meaning of Title 9 U.S.C.A. § 3, the defend-

380

ant is in default in proceeding with arbitration, and has waived its right to demand that procedure. By the express terms of the statute the thwarting default must be "in proceeding with such arbitration." Default under the contract is no bar to arbitration pursuant to an agreement therefor. In re Pahlberg Petition, 2 Cir., 131 F.2d 968; Shanferoke Coal & Supply Co. v. Westchester Service Corporation, 2 Cir., 70 F.2d 297; Kulukundis Shipping Co. v. Amtorg Trading Corporation, 2 Cir., 126 F.2d 978; Almacenes Fernandez v. Golodetz, 2 Cir., 148 F.2d 625. Radiator Specialty Company v. Cannon Mills, 4 Cir., 97 F.2d 318, 117 A.L.R. 299 is not presently in point. There, suit was started by one party to a contract against the other, which did not seasonably ask for a stay pending arbitration, but, rather, answered and filed a counterclaim for a large sum of money. Nine months after issues were thus joined, and after the defendant had once obtained a continuance of the trial, because of the absence of a material witness, it moved for a stay pending arbitration. The court correctly held that the defendant, by that course of action, had waived its right to move for a stay in order to allow arbitration. The present facts are in no wise comparable to those in the cited case. The defendant here has not done, or omitted to do, anything in respect of arbitration which could now bar it from resorting to that procedure. Specifically, the plaintiff's threat in its letters to demand arbitration did not even approach the notice required for the initiation of the process, or require the defendant to take any action in the way of arbitration procedure.

Upon the entire record before it, the court considers that the defendant's motion is well taken and should be granted. An order is announced accordingly.

Counsel for the defendant will promptly prepare and submit to counsel for the plaintiff an order reflecting the ruling thus made, and, upon agreement as to form, to the court for entry. If agreement upon the language of the order be not reached, the court on request of either party will settle it.